[No. 4168.]

## NITRO POWDER COMPANY V. AMERICAN POWDER MILLS.

1. PRINCIPAL AND AGENT — *Agent's Authority — Evidence — Burden of Proof.* Plaintiff seeking to charge defendant with the contracts of another, upon the ground that the latter, in making the contract, acted as agent of defendant, has the burden of proving the agency, and that the agent was acting within his authority. (381.)

   The evidence examined and held insufficient to establish plaintiff's case. (375, 387 379.)

2. —— *Known Limitations Upon the Agent's Authority—Effect.* One dealing with the agent in a matter which, as he knows, is in excess of an express limitation upon the agent's authority, will not be heard to assert that the act of the agent was within the apparent scope of his employment. (381.)

*Error to Denver District Court.* HON. JOHN W. SHEAFOR, Judge.

MR. R. D. THOMPSON and MR. C. J. BLAKENEY, for plaintiff in error.

MR. MILTON SMITH, MR. CHAS. R. BROCK and MR. W. H. FERGUSON, for defendant in error.

BELL, J.

In this action American Powder Mills, defendant in error and plaintiff below, hereinafter called plaintiff, seeks to recover of Nitro Powder Company, plaintiff in error and defendant below, hereinafter called defendant, the value of certain shipments of fuse, which it claims to have sold and delivered to defendant through A. A. MacLean, its agent in Denver.

Both plaintiff and defendant are foreign corporations, authorized to do business in this state, and acting here at the time of the transactions in controversy through agents, George T. Kearns and A. A. MacLean, respectively, by whom the alleged sales were negotiated. Defendant denies any and all knowledge of the purchases so charged to it, made by MacLean, and contends that said MacLean, by virtue of a written contract, was merely its sales agent, with no authority whatever to bind it for any purchases. The case was tried to a jury and resulted in a verdict for plaintiff, upon which judgment was accordingly entered.

On page 3 of its brief and argument plaintiff says: "It appears from the testimony introduced at the trial that MacLean's actual authority was merely to act as sales agent

for the Nitro Powder Company. It is our contention, however, that notwithstanding this actual limitation upon MacLean's power, the Nitro Powder Company is nevertheless liable for the purchase price of the fuse in question, for the reason that MacLean in so purchasing the fuse was acting within the apparent scope of his authority;" and on page 19, after stating the general rule to the effect that where a person holds out another to the public as having a general authority to act for him in the particular business in which he is engaged, third persons may safely deal with the agent in the transaction of such business, it says: "It is upon this principle that we rely to sustain our contentions in this case."

In proof of defendant's liability, plaintiff relies upon the facts that MacLean occupied offices at 51 Bank Block, Denver, upon the door of which was printed, to the knowledge of the defendant company, "Nitro Powder Company, Kingston, N. Y.," with a description of Nitro Palistine Powders and the name "A. A. MacLean, Agent;" that MacLean, with the acquiesence of the defendant company, used stationery upon which was printed the name "The Nitro Powder Co.," with the names of its officers and directors, its New York address, its trade mark, the names of its products, with the dates of their patents, together with the following:

"Dealers in
Fulminating Caps, Batteries, Fuse and Other Mining Supplies.
Western Office,
A. A. MacLean, Agent.		51 Bank Block,
Denver, Colo."

that MacLean carried an account in one of the Denver banks, upon which he drew checks to the order of plaintiff, signed "Nitro Powder Company, A. A. MacLean, Agent," in payment of other shipments of fuse and powder; that the account charged to the defendant company by plain-

tiff covered a period of over five months; that correspondence regarding it received by plaintiff was written on stationery similar to that above described, and signed with a rubber stamp "Nitro Powder Co., ——————— Agent," with MacLean's name or initial preceding the word "Agent;" that the goods in question were ordered by Mac-Lean, or his stenographer, the orders transmitted to the plaintiff company by Kearns, the goods shipped through The Denver Transit & Warehouse Company for the Nitro Powder Company, subject to MacLean's directions, and the invoices for each shipment were mailed to the Nitro Powder Company at Denver, together with the bills of lading.

In *Gates Iron Works v. The Denver Engineering Works Company*, 17 Colo. App., 15-23, 67 Pac., 173, almost identical facts were relied upon by the plaintiff therein to establish its claim for the value of goods, wares and merchandise alleged to have been sold and delivered to the defendant. There, as in the instant case, the evidence showed that the headquarters of the defendant were outside of the state; that B. L. Berkey was its agent in Denver; that the property sold by the plaintiff, and with which it sought to charge the defendant, was mining machinery; and that it was sold to Berkey, who bought it in the name of the defendant. It was not shown that Berkey had any actual authority from the defendant to purchase the machinery, or that his action in the matter was ratified, or that the defendant derived any benefit from the purchase, or knew anything whatever about the use of its name in the transaction. The sole ground upon which the liability was asserted was that the defendant clothed Berkey with an appearance of authority, upon which the plaintiff had the right to rely. This appearance of authority consisted in a sign on the office window bearing the name of the defendant, Gates Iron Works, a description of the manufacturers, the words "Mining Machinery of all Kinds," and underneath the name B. L. Berkey, Manager. This sign was on the window when the

order for the goods was received; the letter head of defendant contained the picture of a machine shop, the defendant's name, the names of its officers, the names of its manufactures, its Chicago address, together with the following: "B. L. Berkey, Man'g'r, 422 Seventeenth St., Denver, Colo.;" defendant's business card, which its agent, Berkey, used, also contained a picture of its manufacturing establishment and machine shops, its name, business and specialties; its Chicago address, and the name of B. L. Berkey as Manager, with the Denver office and telephone number; and it was testified to that Berkey issued a circular announcing his employment by the defendant company, and the opening of his office, and it was shown that the letter head and card came from the defendant, and that the defendant knew that Berkey advertised himself as manager of its Denver office. William J. Miller, general manager of the plaintiff company, testified that the plaintiff had no knowledge of the relations which Berkey bore to the defendant, other than that furnished by the letter heads and sign on the office window; that he made no inquiry with reference to the authority of Berkey from anyone, and that he relied simply on "the letter head and what was painted on the office, and their business card and circular." Passing upon these facts, the court said:

"There was nothing in the evidence of authority which Mr. Miller saw, and upon which he relied, to warrant him in assuming that Mr. Berkey had any authority to buy mining machinery. So far as appearances went—at least appearances for which the defendant was responsible—the purchase of mining machinery was no part of the defendant's business; and there was nothing to indicate that Mr. Berkey was empowered to act outside of its business. There was no apparent authority in Berkey to buy this machinery; and in order to bind the defendant by his contract, the burden was on the plaintiff to prove that the purchase was specially authorized by it."

In the case at bar, as in the case above cited and quoted, plaintiff relies upon the appearance of MacLean's authority, as evidenced by the facts hereinbefore stated, and here, as there, it was shown that the sign was upon the door of the offices occupied by MacLean, with the knowledge of the vice-president and general manager of the defendant company, before the orders in controversy were received, and that defendant company furnished MacLean with some of its stationery, from which he had similar stationery printed, which he used with the acquiesence of defendant, with his own name as its agent appearing thereon, together with the address of his Denver office; but in the instant case it also appears, from defendant's stationery used by MacLean, that defendant was the manufacturer of, among other things, "Nitro Electric Fuses," and it can be well said here, as was said in *Gates Iron Works v. The Denver Engineering Works Company, supra,* that "as (MacLean) was held out as the agent of a manufacturer, his apparent authority extended only to the sale of the goods manufactured by his principal." Of course, the stationery of the defendant advertises it also as a "Dealer," but the fact that it appears as a manufacturer, and particularly of fuse, the product in controversy, was sufficient to at least put the plaintiff on inquiry as to the extent of the authority of its agent, with whom it was attempting to do business.

But further it was shown that MacLean traded in fuse, aside from his connection with the defendant company, and had a contract with Kearns, plaintiff's agent, in which he was appointed as Kearn's agent to sell 350 cases of fuse, and Kearns testified that under the contract, MacLean sold quite an amount of the fuse. Mr. Metzger, vice-president and general manager of the defendant company, testified that after MacLean's death, Kearns claimed all the proceeds collected by the MacLean estate from the sale of fuse, including that in controversy, and that he (Metzger) made claim for the proceeds collected from the sale of dynamite,

but none from the sale of fuse; that the defendant company never received any of the fuse sued for, nor the proceeds from the sale of any such fuse; that it never received a statement, bill or any notice from the plaintiff of any of the alleged sales, and that the first notice had by defendant of the claim made against it was when he (Metzger) was served with the summons and complaint in this case, after the MacLean estate had been settled.

But, even further, it was shown by the testimony of Kearns himself that he was well acquainted with MacLean for about a year or more before any of the sales were made, and knew then that the defendant company did not handle or sell fuse or caps in Colorado. He testified that MacLean said he expected Mr. Metzger, vice-president and general manager of the defendant company, "would be in Denver shortly, and he (MacLean) would like it arranged so that I could meet Mr. Metzger and impress upon him the necessity of their company handling fuse and caps; that he was not familiar with the trade, and that he was practically a new man with the trade, and that he was practically a new man with them, and it might have the desired effect. * * *."

Continuing, he testified, in part, as follows:

"Well, Mr. MacLean and I had more than one conversation; we had two or three, or a half dozen along those lines at different times. * * * when Mr. Metzger came to Denver, Mr. MacLean advised me, and the next morning I went to their office, 51 Bank Block, and Mr. Metzger, I believe, was there at the time, or came in very shortly afterwards—I believe he was there when I came in— * * * and we three went into the back office and talked over the situation, I think, for a full hour or more, and I explained to Mr. Metzger my experience in handling powder in Colorado, and the necessity of powder companies selling fuse and caps; I was interested particularly in the sale of fuse and caps, because I could make a profit by selling to the Nitro Powder Company, and he agreed with me. After

we left the little office, the small inner office, we came out in the outer office, Mr. Metzger and myself, and Mr. Mac-Lean remained seated, and we stayed there by a window *. * *. I stated I might do some powder business with Mr. MacLean later, and that I could exchange fuse with him for powder, and I also explained this new fuse we had, the Seal of Colorado—no one else had a right to make it—and he went on buying this fuse from me. Nothing further was ever said or done in connection with the matter."

It would appear from this testimony that Kearns and, through him, the plaintiff company had knowledge of the limited authority of the agent MacLean, notwithstanding what the evidence of his apparent authority might have been. It is clear that they knew the defendant company did not deal, in Colorado, in fuse and caps, and therefore that MacLean could have no authority to bind it for the purchase or sale of such articles without its act or consent. Kearns, it would seem from the testimony quoted, with this knowledge, undertook to influence the defendant company, through its vice-president and general manager, to engage in the handling of these products in Colorado, and thereby extend the limited authority of MacLean, so that he and Kearns could do business; but nothing in Kearn's testimony, or any other part of the record, shows that the company or its general manager ever consented to such an extension, or did anything to justify Kearns in a belief that such an extension was granted, and no further inquiry is shown to have been made on the part of the plaintiff to ascertain the real extent of MacLean's authority, or to dispel any doubts that Kearns might have entertained in the matter. The most that can be gathered from Kearn's testimony is that Metzger agreed with him as to the necessity of Powder Companies selling fuse and caps, or that he (Kearns) could have made a profit by selling such products to the defendant company. Plaintiff does not contend that in the conversation between Metzger and Kearns, actual

authority was given to MacLean to buy or sell these products, but insists that in doing so he was acting within the apparent scope of his authority.    Since the limited authority of MacLean was known to the plaintiff, it cannot hold the defendant liable for acts done within the apparent scope of his authority, but beyond its known limitations. *Salene v. Queen City Fire Ins. Co.*, 59 Ore., 297, 116 Pac., 1114, 35 L. R. A. (N. S.), 438; *Silver Mountain Co. v. Anderson*, 51 Colo., 305, 117 Pac., 173.

As was said in *Gates Iron Works v. The Denver Engineering Works Co., supra*, "the burden was on the plaintiff to prove the agent's authority and every fact which might tend to make his contract the contract of the principal; and in the absense of such proof, disproof by the defendant was unnecessary." We do not think the record contains the required proof to establish the agency or authority of MacLean to make the purchases charged; and therefore the court erred in refusing to grant defendant's motion for a non-suit, and its judgment should be, and is, hereby reversed.

*Reversed.*